JUDGE ENGELMAYER

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------

# 12 CV 9133

NATIONAL HOCKEY LEAGUE, ANAHEIM DUCKS
HOCKEY CLUB, LLC, BOSTON PROFESSIONAL
HOCKEY ASSOCIATION, INC., HOCKEY
WESTERN NEW YORK, LLC, CALGARY FLAMES
LIMITED PARTNERSHIP, GALE FORCE
HOLDINGS LIMITED PARTNERSHIP, CHICAGO
BLACKHAWKS HOCKEY TEAM, INC.,
COLORADO AVALANCHE LLC, COLHOC
LIMITED PARTNERSHIP, DALLAS STARS L.P.,
DETROIT RED WINGS, INC., REXALL SPORTS
CORP., FLORIDA PANTHERS HOCKEY CLUB
LTD., THE LOS ANGELES KINGS HOCKEY CLUB,
L.P., MINNESOTA WILD HOCKEY CLUB, LP,
CLUB DE HOCKEY CANADIEN, INC., NASHVILLE
HOCKEY CLUB LIMITED PARTNERSHIP, NEW
JERSEY DEVILS, LLC, NEW YORK ISLANDERS
HOCKEY CLUB LP, THE MADISON SQUARE
GARDEN COMPANY, CAPITAL SPORTS &
ENTERTAINMENT, INC., PHILADELPHIA FLYERS
LIMITED PARTNERSHIP, COYOTES NEWCO, LLC,
PITTSBURGH PENGUINS LP, SAN JOSE SHARKS,
LLC, ST. LOUIS BLUES HOCKEY CLUB, L.P.,
LIGHTNING HOCKEY LP, MAPLE LEAF SPORTS
& ENTERTAINMENT LTD., VANCOUVER
CANUCKS LIMITED PARTNERSHIP, LINCOLN
HOCKEY LLC, AND WINNIPEG JETS HOCKEY
CLUB LIMITED PARTNERSHIP,

Plaintiffs,

vs.

NATIONAL HOCKEY LEAGUE PLAYERS'
ASSOCIATION, CRAIG ADAMS, ADRIAN
AUCOIN, ALEX AULD, DAVID BACKES, MARTIN
BIRON, BRAD BOYES, CHRIS CAMPOLI, B.J.
CROMBEEN, MATHIEU DARCHE, MICHAEL DEL
ZOTTO, RICK DIPIETRO, SHANE DOAN,
BRANDON DUBINSKY, MARK EATON, RUSLAN
FEDOTENKO, ALEX GOLIGOSKI, RON HAINSEY,
SCOTT HARTNELL, JAMIE LANGENBRUNNER,
MANNY MALHOTRA, RYAN MCDONAGH, STEVE
MONTADOR, DOMINIC MOORE, BRENDAN

**CLASS ACTION
COMPLAINT FOR
DECLARATORY RELIEF**

_____ Civ. _____ (___)



DEC 1 4 2012

MORRISON, DOUGLAS MURRAY, CRISTOBAL
NIEVES, GEORGE PARROS, CHRIS PHILLIPS,
SHANE PRINCE, CORY SCHNEIDER, JOHN
TAVARES, SHEA WEBER, KEVIN WESTGARTH,
DAN WINNIK, JAMES WISNIEWSKI, HENRIK
ZETTERBERG, and all those similarly situated,

Defendants.

-------------------------------------------------------------------- x

Plaintiffs, the National Hockey League and its member teams (collectively, the "NHL"),
bring this Complaint against defendants, the National Hockey League Players' Association (the
"NHLPA" or the "Union"), the individual defendants, and the defendant class (collectively, the
"Defendants"), and allege upon personal knowledge with respect to themselves and their own
acts, and upon information and belief with respect to all other matters, as follows:

## INTRODUCTION

1.      This action arises from the Union's threatened use of antitrust litigation to extract
more favorable terms and conditions of employment in ongoing collective bargaining
negotiations with the NHL.  In recent days, many Union members have publicly asserted that
they intend to decertify the Union, or vote in favor of the Union's renouncing or "disclaiming
interest" in its role as the exclusive bargaining representative of NHL players, an impermissible
bargaining tactic Defendants mistakenly believe would enable them to commence an antitrust
lawsuit challenging the legality of the NHL's ongoing lockout of NHL players and thereby to
pressure the NHL to accede to the Union's preferred outcome in collective bargaining.  Last
night, the NHLPA Executive Committee authorized that a vote be taken over the next four days
on whether to authorize the Union's leadership to disclaim interest in its role as the exclusive
bargaining representative of NHL players so that the NHL players could commence antitrust
litigation against the NHL in order to secure a more favorable collective bargaining agreement.
The Union's improper threats of antitrust litigation are having a direct, immediate and harmful
effect upon the ability of the parties to negotiate a new collective bargaining agreement.  The
NHL therefore seeks a declaration that the NHL's ongoing lockout, which is lawful as a matter of
federal labor law, does not violate the antitrust laws, and as such, can neither be enjoined nor
result in any legally cognizable or compensable damages to Defendants.

## NATURE OF THE ACTION

2.      This action involves a dispute over the lawfulness of the NHL's exercise of its federally protected labor law right to lock out NHL players in support of the league's bargaining proposals made in the course of collective bargaining negotiations between the NHL and the Union.

3.      The NHL and the Union have had a continuous collective bargaining relationship for more than 40 years, and during that period have entered into numerous collective bargaining agreements, the most recent of which covered the period from July 22, 2005 through September 15, 2012 (the "CBA").  To date, the parties have been unsuccessful in negotiating a successor agreement to the CBA.  When the CBA expired on September 15, 2012, the NHL exercised its right to lock out the NHL players.

4.      In recent days, in the midst of the negotiations over a new collective bargaining agreement, the Union has threatened to abandon or renounce (to decertify or "disclaim interest" in) its role as the exclusive bargaining representative of NHL players, and on December 13, 2012, the NHL players began the process of voting on whether to authorize the Union to do so. The Union has threatened to pursue this course not because it is defunct or otherwise incapable of representing NHL players for purposes of collective bargaining, nor because NHL players are dissatisfied with the representation they have been provided by the NHLPA or no longer wish to engage in concerted activities in negotiating the terms and conditions of their employment.  To the contrary, the NHLPA's threatened decertification or disclaimer is nothing more than an impermissible negotiating tactic, which the Union incorrectly believes would enable it to commence an antitrust challenge to the NHL's lockout, which the Union in turn believes would strengthen its position in negotiations over a renewed labor agreement.

5.      Whatever the NHLPA may choose to call itself after its decertification or purported disclaimer – such as a "trade association" – it will remain a "labor organization" within the meaning of Section 2(5) of the National Labor Relations Act, 29 U.S.C. § 152(5), and thus, the Union's threatened decertification or disclaimer is not intended as a good faith, permanent relinquishment of the right to bargain with the NHL concerning the terms and conditions of employment of NHL players. It instead is designed only to misuse the antitrust laws in an effort to secure more favorable collective terms and conditions of employment and to deny the NHL its right to engage in a lawful lockout.

6.      In reaction to the NHLPA's conduct, the NHL is commencing a proceeding before Region 2 of the National Labor Relations Board (the "NLRB" or "Board") by filing an unfair labor practice charge alleging, among other things, that any purported disclaimer by the Union would be ineffective and a violation of federal labor law – a matter within the exclusive or at least primary jurisdiction of the NLRB.

7.      Defendants assert that immediately upon the Union's purported decertification or disclaimer of interest, the NHL's ongoing lockout, which is lawful under federal labor law, will suddenly be transformed into a violation of the antitrust laws, entitling Defendants to an injunction against the lockout and a claim for treble damages.

8.      The NHL disputes Defendants' assertions and requests a declaration that, because the lockout "involv[es] or grow[s] out of a labor dispute," the Norris-LaGuardia Act deprives the federal courts of jurisdiction to enjoin or restrain the NHL's lockout. See 29 U.S.C. § 104 ("No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating . . . in such dispute . . . from . . . [c]easing or refusing to . . .

remain in any relation of employment . . . [or] withholding from[] any person participating or interested in such labor dispute[,] any . . . moneys or things of value . . . ."), *see also id.* §§ 101, 113; *Brady v. NFL*, 644 F.3d 661, 675 (8th Cir. 2011) (the Norris-LaGuardia Act "plainly encompasses employers" and bars an injunction against an employer's lockout of its employees and other persons interested in a labor dispute).

9.      The NHL also requests a declaration that, whether or not any decertification or disclaimer of interest by the Union would be valid as a matter of labor law, the lockout is lawful and protected from antitrust attack by virtue of the labor exemption provided by Section 20 of the Clayton Act, 29 U.S.C. § 52 ("terminating any relation of employment, or . . . ceasing to . . . employ any party to [a labor] dispute, . . . or withholding from[] any person engaged in such dispute . . . moneys or things of value" shall not "be considered or held to be violations of any law of the United States"), and Section 6 of the Clayton Act, 15 U.S.C. § 17 (as well as by the Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq.*), and thus cannot result in any legally cognizable or compensable injury to Defendants.

10.     The NHL also requests a declaration that the lockout is lawful and protected from antitrust attack by virtue of the non-statutory labor exemption from the antitrust laws. Because the NHLPA's threatened decertification or disclaimer would not be a good faith, permanent relinquishment of the right to bargain with the NHL concerning the terms and conditions of the employment of NHL players and would not be effective as a matter of federal labor law, it has no effect on the continuing application and validity of the non-statutory labor exemption. Nor could the purported decertification or disclaimer have any effect on the validity of the lockout or the application of the non-statutory labor exemption for at least so long as proceedings remain pending before the NLRB. But even if, as a result of the proceedings pending before the NLRB,

the NHLPA's purported decertification or disclaimer is not determined to be ineffective as a matter of federal labor law, the lockout would still not be "sufficiently distant in time and in circumstances from the collective-bargaining process" to terminate the non-statutory labor exemption. *Brown v. Pro Football, Inc.*, 518 U.S. 231, 250 (1996). Accordingly, the non-statutory labor exemption would remain in effect for at least so long as the NHL players continue to act in concert seeking successor terms and conditions of employment applicable to all NHL players. As such, the lockout cannot result in any legally cognizable or compensable injury to Defendants.

11.     The NHL further requests a declaration that, under the implied repeal doctrine, a court, as a matter of law, is precluded from invoking the antitrust laws to condemn the lockout because such an action would be inconsistent with rights of the NHL that are guaranteed and protected by the labor laws.

12.     The NHL also requests a declaration that any purported harm to the NHL players flows from and is a result of the NHL's statutorily-protected lockout and thus cannot provide the basis for an antitrust damages claim.

13.     The NHL requests a further declaration that the lockout is lawful under the antitrust laws because, in a relevant product market for the services of professional hockey players and a worldwide relevant geographic market, it constitutes a reasonable, temporary bargaining measure designed to secure a new collective bargaining agreement, is ancillary to the legitimate purposes of the NHL's joint venture, and its procompetitive justifications therefore outweigh any alleged anticompetitive effects. As such, the lockout cannot result in any legally cognizable or compensable injury to Defendants.

14.     In the event that the court does not grant the declarations described in paragraphs 9 through 13, the NHL requests a declaration that, if the NHLPA's decertification or disclaimer were not deemed invalid by the NLRB, and the collective bargaining relationship between the parties were not otherwise to continue, all existing contracts between NHL players and NHL teams (known as Standard Player's Contracts or "SPCs") would be void and unenforceable. Because the terms of all SPCs are prescribed, governed and regulated by the CBA -- which together with the SPCs comprehensively establish the terms and conditions of employment of all NHL players – the individual SPCs are the product of the collective bargaining process between the NHL and the NHLPA, and, as a matter of federal labor law, are void upon the effective termination of that process and relationship.

15.     In all events, the NHL is requesting these declarations in order to clarify and settle pertinent and meaningful legal issues between itself and Defendants, and to obtain relief from the uncertainty and insecurity that the Defendants have injected into the collective bargaining process by virtue of their threats.  Such a resolution would remove a serious impediment to the ability of the parties to reach a new collective bargaining agreement.

## JURISDICTION

16.     This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, as an action arising under the Sherman Act (15 U.S.C. §§ 1-7) and Clayton Act (15 U.S.C. §§ 12-27, 29 U.S.C. §§ 52-53); under the Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq*; under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; and under 28 U.S.C. § 1367.

17.     Venue is proper in this district pursuant to 29 U.S.C. § 185 and 28 U.S.C. § 1391.

## PARTIES

18.     Plaintiff NHL is organized as a joint venture, with each of the 30 members operating a professional hockey team in a particular geographic location in North America.  The NHL maintains its headquarters at 1185 Avenues of the Americas, New York, New York.

19.     The NHL member teams are owned and operated by the following entities: Anaheim Ducks Hockey Club, LLC (Anaheim Ducks), Boston Professional Hockey Association, Inc. (Boston Bruins), Hockey Western New York, LLC (Buffalo Sabres), Calgary Flames Limited Partnership (Calgary Flames), Gale Force Holdings Limited Partnership (Carolina Hurricanes), Chicago Blackhawks Hockey Team, Inc. (Chicago Blackhawks), Colorado Avalanche LLC (Colorado Avalanche), COLHOC Limited Partnership (Columbus Blue Jackets), Dallas Stars, L.P. (Dallas Stars), Detroit Red Wings, Inc. (Detroit Red Wings), Rexall Sports Corp. (Edmonton Oilers), Florida Panthers Hockey Club, Ltd. (Florida Panthers), The Los Angeles Kings Hockey Club, L.P. (Los Angeles Kings), Minnesota Wild Hockey Club, LP (Minnesota Wild), Club de Hockey Canadien, Inc. (Montreal Canadiens), Nashville Hockey Club Limited Partnership (Nashville Predators), New Jersey Devils, LLC (New Jersey Devils), New York Islanders Hockey Club LP (New York Islanders), The Madison Square Garden Company (New York Rangers), Capital Sports & Entertainment, Inc. (Ottawa Senators), Philadelphia Flyers Limited Partnership (Philadelphia Flyers), Coyotes Newco, LLC (Phoenix Coyotes), Pittsburgh Penguins LP (Pittsburgh Penguins), San Jose Sharks, LLC (San Jose Sharks), St. Louis Blues Hockey Club, L.P. (St. Louis Blues), Lightning Hockey LP (Tampa Bay Lightning), Maple Leaf Sports & Entertainment Ltd. (Toronto Maple Leafs), Vancouver Canucks Limited Partnership (Vancouver Canucks), Lincoln Hockey LLC (Washington Capitals) and Winnipeg Jets Hockey Club Limited Partnership (Winnipeg Jets).

20.     The NHLPA, an unincorporated association, is a labor organization recognized by the NHL and acknowledged by the NLRB as the exclusive collective bargaining representative of all NHL players. The NHLPA regularly represents employees employed in this judicial district for purposes of collective bargaining, and maintains its headquarters at 20 Bay Street, Suite 1700, Toronto, Ontario and an office at 1114 Sixth Avenue, New York, New York from June 2012.

21.     With respect to the individuals named as defendants and class representatives:

(a)     Craig Adams is a professional hockey player currently under contract with the Pittsburgh Penguins. Adams is a member of the NHLPA Negotiating Committee.

(b)     Adrian Aucoin is a professional hockey player currently under contract with the Columbus Blue Jackets. Aucoin is a member of the NHLPA Negotiating Committee.

(c)     Alex Auld is an Unrestricted Free Agent professional hockey player. Auld is a member of the NHLPA Negotiating Committee.

(d)     David Backes is a professional hockey player currently under contract with the St. Louis Blues. Backes is a member of the NHLPA Negotiating Committee.

(e)     Martin Biron is a professional hockey player currently under contract with the New York Rangers. Biron is a member of the NHLPA Negotiating Committee. Biron resides in Armonk, New York.

(f)     Brad Boyes is a professional hockey player currently under contract with the New York Islanders. Boyes is a member of the NHLPA Negotiating Committee.

(g)     Chris Campoli is an Unrestricted Free Agent professional hockey player whose contract with the Montreal Canadiens expired on June 30, 2012. Campoli is currently seeking employment with an NHL Club and is a member of the NHLPA Negotiating Committee.

(h)     B.J. Crombeen is a professional hockey player currently under contract with the Tampa Bay Lightning.  Crombeen is a member of the NHLPA Negotiating Committee.

(i)     Mathieu Darche is an Unrestricted Free Agent professional hockey player whose contract with the Montreal Canadiens expired on June 30, 2012.  Darche is currently seeking employment with an NHL Club and is a member of the NHLPA Negotiating Committee.

(j)     Michael Del Zotto is a Restricted Free Agent professional hockey player. Del Zotto's contract expired on June 30, 2012, and he was subsequently given a Qualifying Offer by the New York Rangers.  Del Zotto did not receive an Offer Sheet from any Club, has not come to terms with the Rangers on an SPC and thus remains a Restricted Free Agent.  Del Zotto resides in New York, New York.

(k)     Rick DiPietro is a professional hockey player currently under contract with the New York Islanders.  DiPietro is a member of the NHLPA Negotiating Committee. DiPietro resides in Oyster Bay, New York.

(l)     Shane Doan is a professional hockey player currently under contract with the Phoenix Coyotes.  Doan is a member of the NHLPA Negotiating Committee.

(m)     Brandon Dubinsky is a professional hockey player currently under contract with the Columbus Blue Jackets.  Dubinsky is a member of the NHLPA Negotiating Committee.  Dubinsky resides in New York, New York.

(n)     Mark Eaton is an Unrestricted Free Agent professional hockey player whose contract with the New York Islanders expired on June 30, 2012.  Eaton is currently seeking employment with an NHL Club.  Eaton resides in Manhasset, New York.

(o)     Ruslan Fedotenko is a professional hockey player currently under contract with the Philadelphia Flyers.  Fedotenko is a member of the NHLPA Negotiating Committee.

(p)     Alex Goligoski is a professional hockey player currently under contract with the Dallas Stars. Goligoski is a member of the NHLPA Negotiating Committee.

(q)     Ron Hainsey is a professional hockey player currently under contract with the Winnipeg Jets. Hainsey is a member of the NHLPA Negotiating Committee.

(r)     Scott Hartnell is a professional hockey player currently under contract with the Philadelphia Flyers. Hartnell is a member of the NHLPA Negotiating Committee.

(s)     Jamie Langenbrunner is a professional hockey player currently under contract with the St. Louis Blues. Langenbrunner is a member of the NHLPA Negotiating Committee.

(t)     Manny Malhotra is a professional hockey player currently under contract with the Vancouver Canucks. Malhotra is a member of the NHLPA Negotiating Committee.

(u)     Ryan McDonagh is a professional hockey player currently under contract with the New York Rangers. After the NHL instituted its lockout, McDonagh signed a contract with Barys Astana of the Kontinental Hockey League (Russia). McDonagh resides in New York, New York.

(v)     Steve Montador is a professional hockey player currently under contract with the Chicago Blackhawks. Montador is a member of the NHLPA Negotiating Committee.

(w)     Dominic Moore is an Unrestricted Free Agent professional hockey player whose contract with the San Jose Sharks expired on June 30, 2012. Moore is currently seeking employment with an NHL Club and is a member of the NHLPA Negotiating Committee.

(x)     Brendan Morrison is an Unrestricted Free Agent professional hockey player whose contract with the Chicago Blackhawks expired on June 30, 2012. Morrison is

currently seeking employment with an NHL Club and is a member of the NHLPA Negotiating Committee.

(y)     Douglas Murray is a professional hockey player currently under contract with the San Jose Sharks. Murray is a member of the NHLPA Negotiating Committee.

(z)     Cristobal Nieves was selected by the New York Rangers in the 2012 NHL Entry Draft, is on the New York Rangers' Reserve List, but has not signed an SPC. He is currently an Unsigned Draft Choice. Nieves resides in Baldwinsville, New York.

(aa)    George Parros is a professional hockey player currently under contracts with the Florida Panthers. Parros is a member of the NHLPA Negotiating Committee.

(bb)    Chris Phillips is a professional hockey player currently under contract with the Ottawa Senators. Phillips is a member of the NHLPA Negotiating Committee.

(cc)    Shane Prince is a professional hockey player currently under contract with the Ottawa Senators. Prince was selected by the Ottawa Senators in the 2011 NHL Entry Draft and signed an Entry Level Contract on July 1, 2012. Prince resides in Spencerport, New York.

(dd)    Cory Schneider is a professional hockey player currently under contract with the Vancouver Canucks. Schneider is a member of the NHLPA Negotiating Committee.

(ee)    John Tavares is a professional hockey player currently under contract with the New York Islanders. Tavares is a member of the NHLPA Negotiating Committee. Tavares resides in New York.

(ff)    Shea Weber is a professional hockey player currently under contract with the Nashville Predators. Weber is a member of the NHLPA Negotiating Committee.

(gg)    Kevin Westgarth is a professional hockey player currently under contract with the Los Angeles Kings. Westgarth is a member of the NHLPA Negotiating Committee.

(hh)     Dan Winnik is a professional hockey player currently under contracts with the Anaheim Ducks.  Winnik is a member of the NHLPA Negotiating Committee.

(ii)     James Wisniewski is a professional hockey player currently under contract with the Columbus Blue Jackets.  Wisniewski is a member of the NHLPA Negotiating Committee.

(jj)     Henrik Zetterberg is a professional hockey player currently under contract with the Detroit Red Wings.  Zetterberg is a member of the NHLPA Negotiating Committee.

## NATURE OF TRADE AND COMMERCE

22.     The NHL is engaged in, among other things, the public exhibition of professional hockey games, an activity that includes a substantial volume of interstate activity.  The NHL's interstate transactions collectively involve annual expenditures and receipts of many millions of dollars.

23.     The NHL's business in interstate commerce includes the production and marketing of NHL games in New York, New York, Buffalo, New York and Uniondale, New York.

## CLASS ACTION ALLEGATIONS

24.     This action is brought, in part, against a defendant class pursuant to Rules 23(a), (b)(1) and (b)(2) of the Federal Rules of Civil Procedure.  The class consists of (a) all hockey players who were, are or will be under contract to play professional hockey for an NHL team during all or any portion of the period commencing on September 15, 2012 and ending on the date of a final and unappealable judgment in this action; and (b) all other persons (including college and other hockey athletes) who, during all or any portion of the period commencing on September 15, 2012 and ending on the date of a final and unappealable judgment in this action, were, are or will be eligible to play hockey for an NHL team as a "Player" (as that term is

defined in the CBA). The individual defendants described in paragraph 21 are the class

representatives.

25.     The class is so numerous and geographically widespread that joinder of all

members is impracticable. At a minimum, the class consists of over 700 players.

26.     There are questions of law and fact common to the class, including the questions

of (a) whether this case involves or grows out of a labor dispute within the meaning of the

Norris-LaGuardia Act, such that the federal courts are without jurisdiction to enjoin or restrain

the lockout of NHL players; (b) whether the lockout of NHL players in support of the NHL's

collective bargaining position is lawful and protected from antitrust attack by virtue of Section

20 of the Clayton Act; (c) whether the lockout of NHL players in support of the NHL's collective

bargaining position is lawful and protected from antitrust attack by virtue of the non-statutory

exemption from the antitrust laws; (d) whether the lockout is protected from condemnation under

the antitrust laws in accordance with principles of implied repeal; (e) whether the lockout can

result in antitrust injury insofar as the statutorily-protected lockout is responsible for any alleged

injury; (f) whether the lockout of NHL players constitutes only a temporary restraint, ancillary to

the legitimate purposes of the NHL's joint venture, and has procompetitive justifications that

outweigh any alleged anticompetitive effects, as measured in a worldwide relevant market for the

services of professional hockey players; and (g) whether, assuming that the NHLPA's purported

decertification or disclaimer is not determined to be ineffective as a matter or federal labor law

and the collective bargaining relationship between the parties does not otherwise continue, the

SPCs are consequently void.

27.     The claims or defenses of the class representatives will be typical of the claims or

defenses of the class. These claims or defenses include the assertions that (a) the Norris-

LaGuardia Act does not prevent a federal court from enjoining the lockout, and the lockout violates the antitrust laws; (b) the lockout of NHL players in support of the NHL's collective bargaining position is not exempt from antitrust attack by virtue of Section 20 of the Clayton Act; (c) because of the NHLPA's purported disclaimer, the lockout of NHL players in support of the NHL's collective bargaining position is not exempt from antitrust attack by virtue of the non-statutory exemption from the antitrust laws; (d) the antitrust laws are not impliedly repealed by federal labor law in this instance; (e) the NHL players suffer antitrust injury as a result of the lockout; (f) absent the statutory and non-statutory exemptions from the antitrust laws, the lockout constitutes an unreasonable restraint of trade; and (g) notwithstanding the NHLPA's purported decertification or disclaimer of interest, the SPCs remain valid and enforceable.

28.     The representative defendants will fairly and adequately protect the interests of the class they represent.

29.     Each player in the class is subject to the lockout that was commenced by the NHL on September 16, 2012.

30.     The prosecution of separate actions by or against individual members of the class would create the risk of (a) inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for the NHL; and (b) adjudications with respect to individual members of the class that would as a practical matter be dispositive of the interests of other class members not parties to the adjudications or substantially impair or impede the ability of such absent class members to protect their interests, thereby making declaratory relief with respect to the questions of law and fact identified above appropriate with respect to the class as a whole.

31.    By locking out NHL players, the NHL has acted or refused to act on grounds generally applicable to the class, thereby making declaratory relief with respect to the questions of law and fact identified above appropriate with respect to the class as a whole.

## ALLEGATIONS COMMON TO ALL CLAIMS

### The NHL-NHLPA Bargaining History

32.    For over 40 years, the NHL has, as a multiemployer bargaining unit, engaged in collective bargaining with the NHLPA over the terms and conditions of employment for NHL players.  During this period, the parties have entered into multiple collective bargaining agreements of increasing length and complexity.

33.    The NHL's historical experience with the NHLPA has been to negotiate and determine terms and conditions of employment exclusively through the traditional collective bargaining process, which has been characterized by hard, good-faith negotiations in the context of a bona fide labor process (with all the rights and obligations that that process entails).  From time to time, this has included resort to the economic weapons of an employee strike or an employer lockout that the labor laws expressly contemplate and endorse.

34.    In 1992, NHL players struck at the end of the NHL's regular season and quickly achieved a negotiated settlement with the NHL Clubs that resulted in the resumption of the regular season and playoffs.  In 1994-95, the NHL owners imposed a lockout at the beginning of the regular season that lasted 102 days and culminated in a shortened schedule for that season and a successor collective bargaining agreement.  In 2004-05, NHL owners and players lost a full season (regular season and playoffs) to an owners' lockout before a new collective bargaining agreement was reached and play was resumed for the 2005-06 season.  In each of these three instances, the labor disputes between the parties ultimately were settled and resolved through the negotiation of new collective bargaining agreements by and between the players'

collective bargaining representative, the NHLPA, on the one hand, and the NHL, as the multi-employer bargaining representative for the NHL Clubs, on the other.

35.     In each and every collective bargaining agreement entered into between the NHL and NHLPA since 1967, the NHL has expressly recognized the NHLPA as the exclusive bargaining representative of all NHL players, and the current CBA describes the NHLPA as "the sole and exclusive bargaining representative of present and future Players in the NHL."

36.     Since 1967, the NHLPA has filed or otherwise participated in 140 litigations, grievances or arbitrations on behalf of its members in its role as their bargaining representative, including numerous unfair labor practice charges before the NLRB.

37.     Further, both the NHL and NHLPA have, for more than forty years, agreed that their collective bargaining relationship is governed by the National Labor Relations Act ("NLRA"), and have often resorted to the NLRB to resolve disputes between them as to various labor practices. This state of affairs has been expressly understood and accepted by the NHLPA, the NHL and the NHL players as being the legal and factual context governing their collective bargaining relationship.

**The Current Dispute**

38.     Between May 30, 2012 and September 15, 2012 (and before that time in some cases), after termination of the 2011-12 NHL season and in preparation for the 2012-13 NHL season, pursuant to the terms of the CBA, NHL Clubs engaged in the process of negotiating or signing players selected in the Entry Draft, making Bona Fida Offers to such players, making Qualifying Offers to Restricted Free Agents, signing Restricted Free Agents to Offer Sheets, signing Unrestricted Free Agents, or negotiating with Players on the Clubs' Reserve Lists. As a

result of signings during this period, 1435 NHL players are currently under contract for the 2012-13 NHL season, 785 of whom are under contract for at least one additional season after 2012-13.

39.     The current CBA was set to expire on September 15, 2012, and negotiations between the NHL and NHLPA for a successor agreement to that CBA formally commenced on June 29, 2012.  In furtherance of its good faith efforts to negotiate this successor agreement, when the CBA expired on September 15, 2012, the NHL exercised its federal labor law right, as part of the collective bargaining process, to impose a lockout of NHL players.  This lockout applied equally to NHL players under contract, as well as Unsigned Draft Choices, Restricted Free Agents, and Unrestricted Free Agents, and permits Clubs to cease their employment relationships with all such players and/or to withhold money, contract offers and employment opportunities from all such players.

40.     Following the institution of the NHL's lockout, the parties have continued to engage in collective bargaining negotiations, and have met on at least 50 separate occasions between June 29 and the present.  On each such occasion, the NHLPA appeared on behalf of and represented NHL players.

41.     These negotiations have included meaningful give-and-take and numerous efforts (by both the NHL and NHLPA) to overcome temporary impasses and move towards a final settlement, all in the context of a good-faith, bona fide labor process.  At the request of the NHLPA so that it could "develop [its] bargaining positions for negotiations toward a new CBA," the NHL has produced over 200,000 pages of NHL and Club financial information, documents relating to officiating records and broadcast contracts, and other highly confidential and proprietary information of the League, its Clubs and their respective affiliated entities.  The NHL also requested and received documents from the NHLPA.  Additionally, the parties have

exchanged proposals throughout the collective bargaining process – the NHL made oral and/or written proposals on July 13, July 25, July 31, August 28, October 16 and November 8 and the NHLPA made oral and/or written proposals on August 14, August 23, August 28, September 12, October 18, November 7 and November 21.

42.    Despite this active collective bargaining process, during which the differences between the parties have narrowed, the NHLPA recently initiated a vote of the NHL players to obtain authorization to disclaim interest in its role as the players' exclusive bargaining representative, and later file an antitrust lawsuit, in an effort to pressure the NHL to accede to its demands.

43.    NHL players began speaking publicly about this strategy and its underlying goals, including Ryan Miller, a member of the Buffalo Sabres, who told the Globe and Mail on November 22, 2012 that the NHLPA intended to use decertification as a "push back" in order to get "real movement" from the NHL.[1]  NHLPA Executive Director Donald Fehr also suggested that the NHLPA was actively considering decertification, stating that "You can look at what's happened in other sports and make your own judgment about [possible NHLPA decertification]."[2]

(a)    NHL player Brad Richards told the New York Daily News on November 28, 2012 that "[Decertification has] been discussed."[3]

---

[1] James Mirtle, *Exasperated Ryan Miller Heartily Endorses Decertification of Union*, Globe & Mail, Nov. 22, 2012, *available at* http://www.theglobeandmail.com/sports/hockey/exasperated-ryan-miller-heartily-endorses-decertification-of-union/article5578329/.

[2] Frank Seravalli, *Fehr Won't Halt Decertification Chatter*, Phila. Daily News, Nov. 24, 2012, http://www.philly.com/philly/blogs/frequentflyers/Fehr-wont-halt-decertification-chatter.html.

[3] Pat Leonard, *NY Rangers' Brad Richards on Lack of Progress Toward Ending NHL Lockout: 'We're Scared for the Game*, N.Y. Daily News, Nov. 27, 2012, *available at* http://www.nydailynews.com/sports/hockey/rangers/richards-lockout-scared-game-article-1.1209050.

(b)     NHL player Shawn Thornton told Comcast SportsNet New England on November 27, 2012 that decertification is "an option we are aware of."[4]

(c)     NHL player Cory Schneider told the Vancouver Sun on November 26, 2012 that the players' "appetite for decertification is much stronger than it was before."[5]

(d)     NHL player Matt Stajan told Comcast Sportnet Philadelphia on December 2, 2012 that decertification is "something [NHL players are] definitely looking at in the not-too-distant future."[6]

(e)     NHL player Dan Clearly told the Detroit Free Press on December 6, 2012 that "decertification will be looked at within days."[7]

(f)     NHL player and NHLPA Negotiating Committee member Chris Campoli told ESPN New York on December 7, 2012 that decertification "is the obvious answer."[8]

44.     Other public sources reported that the NHLPA players have given the "green light to go down the decertification road" and that decertification is "unquestionably on the next page of the NHLPA playbook and that [decertification] is a viable option that may soon become reality."[9]

---

[4] Joe Haggerty, *Players Considering NHLPA Decertification as an Option*, CSNNE.com (Nov. 27, 2012), http://www.csnne.com/hockey-boston-bruins/bruins-talk/Players-considering-NHLPA-decertificatio?blockID=806789&feedID=10428.

[5] Elliott Pap, *Canucks Player Rep Cory Schneider Says Union Decertification a Last Resort*, Vancouver Sun, Nov. 27, 2012, *available at* http://www.vancouversun.com/sports/Canucks+player+Cory+Schneider+says+union/7612313/story.html.

[6] Tim Panaccio, *NHL Notebook: Lockout Continues to Drag On*, CSNPhilly.com (Dec. 2, 2012), http://www.csnphilly.com/hockey-philadelphia-flyers/flyers-talk/NHL-Notebook-Lockout-continues-to-drag-o?blockID=808665&feedID=695.

[7] Helene St. James, *Red Wings' Danny Cleary Fears Season in Danger After NHL Talks Fail*, Detroit Free Press, Dec. 6, 2012. *Available at* http://www.freep.com/article/20121206/SPORTS05/121206037/detroit-red-wings-nhl-gary-bettman-labor-fehr?odyssey=tab|topnews|text|Detroit%20Red%20Wings.

[8] Katie Strang, *NHL Labor Talks Break Down*, ESPN New York (Dec. 7, 2012), http://espn.go.com/new-york/nhl/story/_/id/8721794/nhl-labor-talks-break-just-one-hour-Thursday.

[9] Bob McKenzie, *McKenzie: Three CBA-Related Issues to be Talked About Soon*, TSN.ca (Nov. 22, 2012). http://www.tsn.ca/nhl/story/?id=410081.

45.     In furtherance of this course of action, on information and belief, on December 13, 2012, the NHL players began voting on whether to authorize the Union to disclaim interest in its role as the players' exclusive bargaining representative at any time on or before January 2, 2013 in order to implement this tactic and commence antitrust litigation.  This demonstrates the Union's preparedness and intention to effectuate its threats of decertification or disclaimer and to file antitrust litigation.

46.     Identical tactics have used in labor negotiations in professional sports over the past 30 years, including those within the last year involving the National Basketball Players Association ("NBPA") and the National Football League Players Association ("NFLPA").  In many of these instances, the NFLPA and NBPA were represented by the same attorney -- James W. Quinn -- that currently represents the NHL players.

47.     With Quinn's guidance, the NBPA repeatedly threatened either to "decertify" as a Union or "disclaim interest" as the players' representative in order to invoke the antitrust laws as a tactical measure to gain leverage in its collective bargaining negotiations with the NBA.  In each such case (i.e., in 1976, 1983, 1988, 1994, and 1999), however, the ultimate resolution has always been the same:  a collectively-bargained agreement between the NBA and the NBPA negotiated pursuant to federal labor law containing the very practices the NBPA had challenged as antitrust violations.

48.     For example, in 1988, after the United States District Court for the District of New Jersey rejected the NBA players' argument that the non-statutory labor exemption to the antitrust laws ended immediately upon expiration of the parties' collective bargaining agreement (*see Bridgeman v. NBA*, 675 F. Supp. 960 (D.N.J. 1987)), the player representatives of the NBPA – represented by Quinn – purportedly voted to recommend to the players a decertification

of the Union.  Notwithstanding that vote, the NBPA continued to bargain with the NBA, and the parties reached a new collective bargaining agreement.

49.     After the expiration of that collective bargaining agreement in 1994, the NBPA declared the existence of a bargaining impasse, refused to meet with the NBA and threatened an antitrust lawsuit.  In subsequent litigation, both this Court and the Second Circuit rejected the players' argument that the labor exemption to the antitrust laws ended at bargaining impasse, and found that the NBA's maintenance of employment terms beyond the expiration of the collective bargaining agreement was protected from antitrust attack by virtue of the labor exemption. *See NBA v. Williams*, 45 F.3d 684 (2d Cir. 1995).

50.     Following the decision in the Second Circuit, the NBA players once again turned to the tactic of decertification in an effort to enhance their leverage at the collective bargaining table.  This time, and again represented by Quinn (who had earlier employed the same tactic on behalf of the National Football League Players Association ("NFLPA")), a group of prominent players (including then-NBPA President Patrick Ewing) filed a decertification petition with the NLRB in an attempt to derail a collective bargaining agreement that had been reached between the NBA and the Union.

51.     More recently, in March 2011, with the NFL and NFLPA facing the imminent expiration of their most recent collective bargaining agreement, the NFLPA, advised by Quinn, employed this disclaimer tactic, asserting in *Brady v. NFL* that it was permanently abandoning its role as the collective bargaining representative of NFL players.  This represented the second such disclaimer employed by the NFLPA and produced (entirely predictably) the very same result as its first purported disclaimer – a settlement of antitrust litigation brought by NFL players

(directed and funded by the NFLPA) through the negotiation of a new collective bargaining agreement and the reconstitution of the NFLPA as a union representing all NFL players.

52.    In November 2011, the NBPA announced that it too was disclaiming its role as the collective bargaining representative of NBA players.  The NBA players subsequently filed an antitrust lawsuit, alleging that the NBA's lockout constituted a group boycott and price-fixing in violation of the Sherman Act.  As in the case of the NFL, the antitrust lawsuit was settled and dismissed, and the NBPA reconstituted as a union representing all NBA players, after the parties' reached a new collective bargaining agreement.

53.    As in the cases of the NFL and NBA, the NHLPA's purported decertification or disclaimer has no purpose other than to attempt to create bargaining leverage by misusing the antitrust laws as a tactic to secure a more favorable collective bargaining agreement.  This is made abundantly clear by the numerous public statements made by NHL players in recent days:

(a)    Ryan Miller told the Globe and Mail on November 22, 2012:  "After watching the other sport leagues go through labor disputes last year, it is apparent that until decertification is filed, there will not be any real movement or negotiation. Many things in our negotiation are very consistent with the NFL and NBA negotiations, and both of those leagues filed papers necessary to decertify. . . .  Decertification becomes part of the script . . . [and] is a push back and should show we want a negotiation and a fair deal on at least some of our terms."[10]

(b)    NHL player Andrew Ladd told the Winnipeg Sun on November 24, 2012: "[NHL players] realize [moving to decertify is] one of our options and to be honest with you, I think it would be a good one for us.  At some point, you have to start fighting back.  We don't

---

[10] Mirtle, *supra* note 1.

have much leverage. We know that they're just trying to wait us out so we might as well try to do something."[11]

(c) NHL player Ray Whitney told ESPN.com on November 23, 2012: "[Decertification is] going to have to be somewhat of a reality at some point . . . We have to look at all our options to increase our leverage."[12]

(d) NHL player and NHLPA Negotiating Committee member George Parros told The Fan 590 AM (Toronto) on November 26, 2012: "[Decertification] is an option of ours for sure. . . . [T]he idea is that it forces a deal to get done sooner. . . . We've been given a lot of information about it."

(e) NHL player and NHLPA Negotiating Committee member Cory Schneider told the Vancouver Sun on November 26, 2012: "The appetite for decertification is much stronger than it was before. . . . As players, one of the only options we have to really apply a little pressure on them and show them that we're serious is to decertify. . . . We've seen that the only way the other leagues got a deal done was that the unions decertified or started the process."[13]

(f) NHL player Marc Methot told the Ottawa Sun on November 26, 2012: "[Decertification] can also put a little pressure on the owners to maybe settle on something a little more reasonable. If it puts pressure on everybody to get something done, I'm all for it."[14]

---

[11] Tim Campbell, *Ladd Shrugs Off Loss of More Games*, Winnipeg Free Press, Nov. 24, 2012, *available at* http://www.winnipegfreepress.com/sports/hockey/nhl/ladd-shrugs-off-loss-of-more-games-180669831.html.

[12] Pierre LeBrun, *Whitney: NHL Behaving Like 'Bullies'*, ESPN.com (Nov. 23, 2012),http://espn.go.com/blog/nhl/post/_/id/20361/whitney-nhl-is-behaving-like-schoolyard-bullies.

[13] Pap, *supra* note 5.

[14] Don Brennan, *Ottawa Senators Defenceman Marc Methot and Other NHLers Work Out with the Carleton Ravens*, Ottawa Sun, No. 26, 2012, *available at* http://www.ottawasun.com/2012/11/26/ottawa-senators-defenceman-marc-methot-and-other-nhlers-work-out-with-the-carleton-ravens.

(g)     NHL player Daniel Alfredsson told the Ottawa Sun on November 27, 2012: "[Decertification is] one avenue for us to force their hand a bit at something.  It's pretty much the only avenue to go if we want to do that."[15]

(h)     NHL player Jonathan Toews told CSNChicago.com on November 30, 2012: "[Decertification is] an option. . . . [A]t some point the players have certain negotiating tactics that we need to use."[16]

(i)     NHL player Troy Brouwer told CSNChicago.com on November 30, 2012: "Right now, [decertification] is a viable option for us.  If nothing is going to push the owners to even want to negotiate, maybe this will force their hand. . . . [Decertification is] definitely in the dialogue."[17]

54.     In the recent days and weeks, NHL players have voiced their support for Executive Director Don Fehr, and Steve Fehr, special counsel to the NHLPA, said the union had been getting "amazing support" from the players.[18]  These comments do not suggest that the NHL players are unhappy with their Union representation, wish to oust current NHLPA leadership, permanently disband the Union, or prefer to pursue bargaining aims on an individual basis.  Instead, they indicate that the NHLPA and NHL players intend to employ disclaimer as a temporary negotiating tactic in their search for leverage in an ongoing collective bargaining process.

---

[15] Don Brennan, *Ottawa Senators' Daniel Alfredsson: 'Every Player is Pissed Off' about NHL Lockout*, Ottawa Sun, Nov. 27, 2012 (alteration in original), *available at* http://www.ottawasun.com/2012/11/27/ottawa-senators-daniel-alfredsson-says-nhlpa-firmly-behind-donald-fehr.

[16] Tracey Myers, *More of the Same for NHL, NHLPA; What's Next?*, CSNChicago.com (Nov. 30, 2012), http://m.nbcsports.com/content/blackhawks-players-differ-what-union%E2%80%99s-next-move-should-be.

[17] *Id.*

[18] Sam Carchidi, *NHL Cancels Two More Weeks of Games plus All-Star Game*, Phila. Inquirer, Nov. 24, 2012, *available at* http://articles.philly.com/2012-11-24/sports/35334693_1_wayne-simmonds-simmonds-and-jody-shelley-nhl-claims.

(a)     NHL player Bobby Ryan told the Washington Times on October 31, 2012:

"[T]he union is extremely strong right now.  From what I understand, it's the strongest it's ever

been, and guys are really looking to get in on this."[19]

(b)     NHL player Shawn Thornton told the Washington Times on October 31,

2012: "I'm on board with the union. . . ."[20]

(c)     NHL player Daniel Alfredsson told the Ottawa Sun on November 27,

2012:  "[W]e're really confident in what [Donald Fehr is] doing and feel really good about his

leadership. We kind of gave him a feeling that we're totally behind him."[21]

(d)     A New York Post article on November 23, 2012 stated that the players are

"united . . . in support of Don Fehr."[22]

(e)     After those recent negotiations ended on December 6, 2012, a number of

players published "tweets" in support of NHLPA Executive Director Donald Fehr and the

NHLPA more generally:

> (i)     NHL player Matt Carle (@mattcarle25): "Big
> thanks to the players and @NHLPA staff in NYC representing #theplayers for
> their hard work over the last couple of days #fullsupport."[23]

> (ii)     NHL player Logan Couture (@Logancouture):
> "100 percent in agreement with our @NHLPA leader for all if you [are] asking."[24]

> (iii)     NHL player Scottie Upshall (@ScottieUpshall):
> "Plain and simple these owners think they can break us apart. GOOD LUCK! We
> r stronger than we've ever been and r behind Fehr %100 [sic]"[25]

---

[19] Stephen Whyno, *NHL Lockout 2012: Unified, Players Roll with Punches*, Wash. Times, Oct. 31, 2012, *available at* http://www.washingtontimes.com/news/2012/oct/31/nhl-lockout-2012-unified-players-roll-with-punches/print/.

[20] *Id.*

[21] Brennan, *supra* note 15.

[22] Larry Brooks, *Bettman's Message Delivers Player Unity*, N. Y. Post, Nov. 23, 2012, *available at* http://www.nypost.com/p/sports/devils/nhlpa_sees_for_itself_e2b6790E5s6jeol5qaYv3I.

[23] https://twitter.com/mattcarle25 (Dec. 6, 2012 at 8:12 P.M.).

[24] https://twitter.com/Logancouture (Dec. 6, 2012 at 6:58 P.M.).

55.     As these recent comments show, this decertification or disclaimer is simply a tactical maneuver designed to enable the players to contend that there no longer exists a collective bargaining relationship between the NHL and the NHLPA, eliminating (in their view) any bar to the NHL players' antitrust claims against the NHL (including their threatened antitrust attack on the ongoing lockout), and thus allowing the NHL players to use antitrust litigation to secure a new collective bargaining agreement more favorable to them.  Led by attorney James Quinn, the NHLPA (just like the NFLPA and NBPA before it) has no intention of permanently renouncing its status as the bargaining representative of the NHL players (nor would the NHL players favor such renunciation) and, once it achieves its desired objective of securing better terms, will resurrect itself as a full-fledged union notwithstanding its prior "decertification" or "disclaimer."

56.     In light of the NHLPA's threat of disclaimer or decertification, the voting by NHL players concerning authorization to proceed down that path, as well as the disruptive effect this threat has had on the bargaining between the parties and the NHL's exercise of its labor law right to continue the lockout, the NHL is initiating a proceeding before the NLRB alleging, among other things, that:

(a)     the NHLPA has engaged in an unfair labor practice by failing to bargain in good faith in an effort to reach a successor collective bargaining agreement, but rather engaging in a strategy calling for a sham disclaimer followed by antitrust litigation; and

(b)     any purported disclaimer by the NHLPA would be invalid and ineffective under federal labor law.

---

[25] https://twitter.com/ScottieUpshall (Dec. 6, 2012 at 4:43 P.M.).

57.     The NHL continues to exercise its federal labor law right to maintain the lockout despite threats of antitrust litigation and a disclaimer to facilitate such litigation. A purported disclaimer of interest or decertification by the NHLPA and an antitrust challenge to the NHL's exercise of its federal labor law right to lock out NHL players are imminent.

58.     Even in the event that the NHL players elect not to decertify or disclaim and subsequently file an antitrust lawsuit, the now publicly-acknowledged and realistic possibility of such actions is causing uncertainty regarding the parties' respective legal rights and obligations and is impeding the NHL's legitimate efforts to negotiate a new CBA. This dispute is sufficient to warrant this Court's intervention.

## The Inextricable Relationship Between the CBA and the Standard Player Contract

59.     The NHL SPC appears as Exhibit 1 to the CBA. Paragraph 18 of the SPC states that the "SPC is entered into subject to the CBA between the NHL and NHLPA and any provisions of this SPC inconsistent with such CBA are superseded by the provisions of the CBA," with many of the terms in the SPC "hav[ing] the meaning set forth in the CBA."

60.     In this regard, the SPCs are a product of the CBA and an ongoing collective bargaining relationship between the NHL and NHLPA. As such, in the absence of a valid CBA or collective bargaining relationship, the provisions of the NHL SPCs will no longer have any force or effect.

61.     The precise relationship between a collective bargaining agreement and a player contract was explored in a 1998 arbitration between the NBPA and the NBA. In reaction to the 1998 lockout, the NBPA initiated a grievance on behalf of more than 200 NBA Players who were parties to purportedly "fully guaranteed contracts for the 1998/1999 NHL Season," claiming, among other things, "[t]hat the NBA and its teams anticipatorily breached each of

those contracts by advising the Players Association that the teams will not pay the salaries due under these guaranteed contracts during the NBA's 'lockout.'"

62.     On October 19, 1998, the NBPA's grievance was denied in its entirety.  The Arbitrator presiding over the matter held "that the salary provisions of the Player Contracts are not effective or operative during a lawful lockout following the termination of the Collective Bargaining Agreement."  In reaching this conclusion, the Arbitrator stated that "it cannot be reasonably questioned that the [Player Contracts] signed by the Players involved in this proceeding are controlled by, dependent upon and closely intertwined with the CBA.  Indeed, a contract between a Player and a team has meaning only in relation to a system of contracts of many players and teams within a sport."  The Arbitrator further concluded that "[t]he CBA is the creator of the [Player Contracts] and governs them," and the fact that the SPCs specifically refer to and rely on a number of CBA provisions, reflects the "dominance of the CBA with respect to Player Contracts."

63.     Accordingly, in the event the NHLPA's decertification or disclaimer were found not to be invalid, and the collective bargaining relationship between the parties were not otherwise to continue, the SPCs – which were the product of that collective bargaining relationship and are dependent on the continuation of that relationship – would be void and unenforceable as a matter of law.

## FIRST CLAIM FOR RELIEF

64.     The foregoing paragraphs are hereby incorporated as though fully set forth herein.

65.     The lockout involves and grows out of a labor dispute.  The NHL imposed the lockout as part of a dispute with the NHL players over the terms and conditions of their employment.  The NHL and the players, including Defendants, are engaged in the same industry

(professional hockey), and the dispute is between one or more employers or associations of employers (the NHL and the NHL teams) and one or more employees (the players). *See* 29 U.S.C. §113 (defining a "labor dispute" as "any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating . . . terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee").

66. The lockout involves, among other things, the NHL ceasing or refusing to remain in any relation of employment with NHL players and withholding from NHL players, and persons seeking to become NHL players, moneys or things of value, including contract offers. Therefore, federal courts lack jurisdiction to enjoin or restrain the ongoing lockout under the Norris-LaGuardia Act. *See* 29 U.S.C. § 104 ("No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating . . . in such dispute . . . from . . . [c]easing or refusing to . . . remain in any relation of employment . . . [or] withholding from[] any person participating or interested in such labor dispute[,] any . . . moneys or things of value . . . ."); *see also Brady v. NFL*, 640 F.3d 785, 792 (8th Cir. 2011) (the Norris-LaGuardia Act "bars injunctions against lockouts by employers"). Such protected conduct therefore cannot result in any legally cognizable or compensable damage to the NHL players.

67. Defendants dispute the NHL's contentions set forth in paragraphs 65 and 66. There thus exists a substantial, present and justiciable controversy between the NHL and the Defendants as to whether the Norris-LaGuardia Act deprives federal courts of jurisdiction to enjoin or restrain the lockout.

68.     By reason of the foregoing, the NHL is entitled to a declaration that the Norris-LaGuardia Act deprives the federal courts of jurisdiction to enjoin or restrain the lockout.

## SECOND CLAIM FOR RELIEF

69.     The foregoing paragraphs are hereby incorporated as though fully set forth herein.

70.     Federal labor laws afford employers, including the members of a multiemployer bargaining unit, the right to lock out their employees.  The right to lock out is the employers' counterpart to the employees' right to strike.

71.     Regardless of the validity of any purported decertification or disclaimer by the Union, the imposition of a lockout of NHL players in support of the NHL's collective bargaining position (i) cannot be enjoined and (ii) is not a violation of the antitrust laws because such conduct is protected from antitrust attack by virtue of the labor exemption set forth in Section 20 of the Clayton Act, which explicitly states that persons acting "in concert" may not be prohibited from "terminating any relation of employment, or . . . ceasing to . . . employ any party to [a labor] dispute . . . or withholding from[] any person engaged in such dispute . . . moneys or things of value," nor shall such conduct "be considered or held to be violations of any law of the United States."  29 U.S.C. § 52; *see also NBA v. Williams*, 45 F.3d 684, 689 (2d Cir. 1995) (Section 20 "permit[s] multiemployer lockouts").

72.     Insofar as such conduct cannot "be considered or held to be a violation of any law of the United States," it cannot, as a matter of law, result in any legally cognizable or compensable damage to the NHL players.  A finding that the NHL and Clubs may be liable for damages flowing from such conduct makes illegal that which Section 20 of the Clayton Act expressly declares to be legal.

73.     Defendants contend to the contrary.  There thus exists a substantial, present and justiciable controversy between the NHL and the Defendants concerning the antitrust legality of

the NHL's ongoing lockout of NHL players in support of the NHL's collective bargaining

position and the existence of liability flowing therefrom.

74.     By reason of the foregoing, the NHL is entitled to a declaration that its lockout of

NHL players in support of its bargaining demands does not violate the antitrust laws and cannot

result in any legally cognizable or compensable damages to NHL players.

### THIRD CLAIM FOR RELIEF

75.     The foregoing paragraphs are hereby incorporated as though fully set forth herein.

76.     Despite any purported disclaimer of interest, the NHLPA is and will continue to

be a labor organization within the meaning of the NLRA, with the purpose, in whole or in part,

of dealing on a concerted basis with the NHL with respect to the terms and conditions of

employment of NHL players.

77.     The lockout is being imposed by the NHL during, and as an integral part of, the

collective bargaining process and as a lawful exercise of the NHL's federal labor law rights.

78.     Where there is – as here – an unfair labor practice charge pending before the

Board (which here includes the specific issue of the validity of any disclaimer by the NHLPA, an

issue over which the NLRB has exclusive jurisdiction), the non-statutory labor exemption will

continue to apply at least "until final resolution of Board proceedings and appeals therefrom."

*Powell v. NFL*, 930 F.2d 1293, 1303-04 (8th Cir. 1989).  At a minimum, then, a federal court

cannot find that the non-statutory labor exemption has expired at least until the NLRB has issued

a decision on the NHL's unfair labor practice charge.

79.     Thus, the non-statutory labor exemption will continue to protect the lockout from

antitrust scrutiny because, notwithstanding the NHLPA's purported decertification or disclaimer,

there will continue to be a collective bargaining relationship between the NHL and the NHLPA.

80.     Even if the more than 40-year collective bargaining relationship between the NHL and the NHLPA were no longer in place and even if it were unlikely to be revived, the non-statutory labor exemption would continue to protect the lockout from antitrust scrutiny unless and until there has been a "sufficient[] distan[ce] in time and in circumstances from the collective bargaining process [such] that a rule permitting antitrust intervention would not significantly interfere with that process." *Brown v. Pro-Football, Inc.*, 518 U.S. 231, 250 (1996). No such distance in time and circumstances from the collective bargaining process can be found to exist in this case.

81.     In the first instance, based on numerous public comments of NHL players and NHLPA leadership, among other things, it is clear that the NHLPA's purported disclaimer is a "tactical maneuver and not a good-faith renunciation of its representational rights," *Int'l Bhd. Of Elec. Workers*, 119 N.L.R.B. 1792, 1799 (1958), enforced sub nom. *NLRB v. Int'l Bhd. of Elec. Workers*, 266 F.2d 349 (5th Cir. 1959), and is "employed only as a measure of momentary expedience" in collective bargaining negotiations. *Retail Assocs., Inc.*, 120 N.L.R.B. 388, 391-92 (1958). Such a disclaimer cannot move the parties to a time and circumstance "sufficiently distant" from the collective bargaining process, and thus, as a matter of law, cannot end the non-statutory labor exemption. *See Brown*, 518 U.S. at 242, 250.

82.     Additionally, so long as the NHL players continue to act in concert, and without having shown any "instability" or "defunctness" of the NHLPA as a bargaining unit, the lockout is not sufficiently distant in circumstances from the collective bargaining process. By the same token, the NHLPA's purported disclaimer cannot unilaterally serve as the temporal expiration of the non-statutory labor exemption. Instead, the lockout remains sufficiently close in time to the collective bargaining process to keep that exemption in full force and effect.

83.     As such, notwithstanding any purported decertification or disclaimer of interest by the NHLPA, the non-statutory labor exemption applies to the NHL's lockout and insulates that conduct from antitrust scrutiny.  Such protected conduct therefore cannot result in any legally cognizable or compensable damage to the NHL players.

84.     Defendants dispute the NHL's contentions set forth in paragraphs 76 through 83 and have threatened antitrust litigation against the lockout.  There thus exists a substantial, present and justiciable controversy between the NHL and the Defendants concerning the antitrust legality of the NHL's ongoing lockout of NHL players in support of the NHL's collective bargaining position.

85.     By reason of the foregoing, the NHL is entitled to a declaration that its lockout of NHL players in support of its bargaining demands does not violate the antitrust laws and does not result in any legally cognizable or compensable damages to NHL players.

## FOURTH CLAIM FOR RELIEF

86.     The foregoing paragraphs are hereby incorporated as though fully set forth herein.

87.     Even if it is determined that Section 20 of the Clayton Act does not provide express antitrust immunity (insofar as the NHL's lockout may be enjoined or result in legally cognizable and compensable damages to NHL players), and the non-statutory exemption does not provide antitrust immunity for the ongoing lockout, and that the Norris-LaGuardia Act does not deprive this court of jurisdiction to enjoin or restrain the lockout, certain labor tactics, including the NHL's ability to lock out the NHL players, have been recognized as part and parcel of a federally-created labor law scheme (embodied most clearly by the Norris-LaGuardia Act, 29 U.S.C. § 101 *et seq.*, and Section 20 of the Clayton Act, 29 U.S.C. § 52) and one of the "offsetting tools" provided by federal labor laws to parties in a labor dispute. *Powell*, 930 F.2d at 1302.

88.     As such, even absent an express statutory exemption, under the doctrine of implied repeal, a court cannot condemn under the antitrust laws conduct that constitutes the exercise of a substantive labor law right – i.e., the NHL's right to institute a lockout, nor can it properly determine that legally cognizable and compensable damages flow from such conduct.

89.     Defendants' requested application of the antitrust laws in this instance would "'subvert fundamental principles of [U.S.] federal labor policy,'" *Williams*, 45 F.3d at 690 (quoting *Wood v. NBA*, 809 F.2d 954, 959 (2d Cir. 1987)), and is clearly incompatible with the existing (and thoroughly regulated) labor law scheme, an area properly left to the NLRB. Therefore, imposing antitrust liability, particularly treble damages, on the NHL for its lockout presents "'a substantial danger that [the NHL] would be subjected to . . . inconsistent standards,'" *Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264, 275 (2007) (citation omitted), creates a "clear repugnancy" between the antitrust laws and the labor laws, *United States v. NASD*, 422 U.S. 694, 719 (1975), and would do exactly what the Norris-LaGuardia Act, the Clayton Act and NLRB have sought to avoid – the insertion of courts into labor disputes and removal of employer lockouts as a legitimate tool of multiemployer bargaining units.

90.     Defendants dispute the NHL's contentions set forth in paragraphs 87 through 89. There thus exists a substantial, present and justiciable controversy between the NHL and the Defendants as to whether a federal district court can invoke the antitrust laws to condemn conduct permitted under federal labor law.

91.     By reason of the foregoing, the NHL is entitled to a declaration that, under the doctrine of implied repeal, Defendants, as a matter of law, are precluded from invoking the antitrust laws to condemn a substantive right (an employer's right to lock out its employees) guaranteed by the labor laws.

## FIFTH CLAIM FOR RELIEF

92.     The foregoing paragraphs are hereby incorporated as though fully set forth herein.

93.     Even if it is determined that Section 20 of the Clayton Act and the non-statutory exemption do not provide antitrust immunity for the ongoing lockout, and that the doctrine of implied repeal does not apply in this instance, federal courts lack jurisdiction to enjoin or restrain the ongoing lockout under the Norris-LaGuardia Act, notwithstanding alleged violations of the Sherman Act.

94.     No antitrust injury can flow from an action that an employer is lawfully entitled to take and that is not itself an antitrust violation.

95.     Insofar as the NHL players cannot enjoin the lockout, they must therefore recognize its lawfulness.  As such, the harm they are likely to allege in their antitrust lawsuit flows from, and is fully accounted for by, the statutorily-protected lockout rather than from any aspect of the lockout that they believe constitutes an antitrust violation.  Therefore, even if the allegedly illegal aspects of the lockout were to be removed or otherwise resolved, the NHL players would still suffer the same harm as a result of the lawful aspects of the lockout.

96.     Defendants dispute the NHL's contentions set forth in paragraphs 93 through 95. There thus exists a substantial, present and justiciable controversy between the NHL and the Defendants as to whether the NHL players have sustained antitrust injury as a result of the lockout or can properly show that the allegedly unlawful aspects of the lockout are responsible for their alleged antitrust injuries.

97.     By reason of the foregoing, the NHL is entitled to a declaration that any harm to the NHL players is a result of the lawful aspects of the NHL's lockout and thus cannot form the basis of an antitrust damages claim.

## SIXTH CLAIM FOR RELIEF

98.     The foregoing paragraphs are hereby incorporated as though fully set forth herein.

99.     Even if it is determined that Section 20 of the Clayton Act and the non-statutory exemption do not provide antitrust immunity for the ongoing lockout, and that the Norris-LaGuardia Act does not deprive this court of jurisdiction to enjoin or restrain the lockout, the NHL contends that the lockout is not a violation of the antitrust laws because, in a worldwide relevant market for the services of professional hockey players, it constitutes a temporary bargaining measure designed to secure a new collective bargaining agreement, is ancillary to the legitimate purposes of the NHL's joint venture, and has procompetitive justifications that outweigh any alleged anticompetitive effects.  Such protected conduct therefore cannot result in any legally cognizable or compensable damage to the NHL players.

100.     The NHL competes with professional hockey leagues in Russia, Sweden, Finland, Switzerland, Germany and other European countries for the services of professional hockey players, including Defendants.  As such, there exists a worldwide relevant market for the services of professional hockey players.

101.     These professional leagues are viable substitutes for the NHL, as evidenced by the fact that NHL players routinely elect to play in a European league instead of in the NHL, more than 100 NHL players are currently playing abroad and, during the NHL's previous lockout, more than 400 NHL players elected to play in Europe.  For this reason, the impact of the NHL lockout on the market for the services of professional hockey players is minimal.

102.     The NHL's temporary lockout has numerous pro-competitive benefits.  Through the lockout, the NHL seeks to bring about a new collective bargaining agreement designed to level the playing field by the establishment of common terms and conditions of employment for all 30 NHL Clubs and by fostering financial stability and competitive balance among its Clubs,

which in turn will attract fans, sponsors, broadcast rights holders and other constituents. The

NHL's previous lockout supported (and achieved) a similar goal. The system of common

employment rules implemented in 2005 improved the financial stability of the entire NHL,

including most of its Clubs, improved competitive balance across the NHL and helped the

League to grow its revenues, build and increase its fan base, and negotiate better broadcasting

and sponsorship agreements, all while player salaries also improved dramatically. This

temporary lockout supports a collective bargaining agreement designed to further those same

pro-competitive ends, which outweigh any anticompetitive effects that may result.

103.    Defendants dispute the NHL's contentions as set forth in paragraphs 99 through

102 and have threatened antitrust litigation challenging the legality of the lockout. There thus

exists a substantial, present and justiciable controversy between the NHL and the Defendants

concerning the antitrust legality of the NHL's ongoing lockout of NHL players in support of the

NHL's collective bargaining position.

104.    By reason of the foregoing, the NHL is entitled to a declaration that its lockout of

NHL players in support of its bargaining demands does not violate the antitrust laws and does

not result in any legally cognizable or compensable damages to NHL players.

## SEVENTH CLAIM FOR RELIEF

105.    The foregoing paragraphs are hereby incorporated as though fully set forth herein.

106.    Under the CBA, the NHL recognized the Union as the exclusive collective

bargaining representative of NHL players; and pursuant to the National Labor Relations Act, 29

U.S.C. § 151 *et seq.*, the Union was certified as the exclusive collective bargaining representative

of NHL players.

107.    As a consequence of such recognition and certification, Section 9(a) of the

National Labor Relations Act, 29 U.S.C. § 159(a), requires that all terms and conditions of

employment of players employed by NHL teams be negotiated on a collective basis between the NHL and the Union, absent an express agreement between those parties authorizing individual negotiations.

108.   The NHL and the Union have, in numerous prior rounds of collective bargaining, repeatedly agreed to authorize individual negotiations between players and teams within the framework of the CBA and the SPC.  The SPCs are the product of these negotiations, and thus of the collective bargaining process, and include employment terms agreed to by the NHL and Union during that process.  Further, the SPCs refer to and incorporate numerous terms and conditions of player employment set forth in the CBA, and rely on the CBA to establish other terms and conditions of player employment that are not expressly set forth in the SPCs.  Thus, the SPCs are controlled by, dependent upon and closely intertwined with the CBA.

109.   Based upon the foregoing, if the Union's purported decertification or disclaimer of interest were ultimately not deemed invalid, and the collective bargaining relationship between the parties were not otherwise to continue, the SPCs would be void and unenforceable.  Such void and unenforceable contracts cannot give rise to any legally cognizable or compensable damages in the event they are not performed.

110.   Defendants contend to the contrary.  There thus exists a substantial, present and justiciable controversy between the NHL and the Defendants as to whether the Union's purported disclaimer of interest and the termination of the parties' collective bargaining relationship render the SPCs void and unenforceable.

111.   By reason of the foregoing, the NHL is entitled to a declaration that if the Union's disclaimer is ultimately not deemed invalid, and the collective bargaining relationship between the parties does not otherwise continue, the SPCs would be void and unenforceable, no player

would be entitled to any benefits or other terms and conditions of employment pursuant to such

SPCs, and the NHL and Clubs' failure to perform cannot give rise to legally cognizable or

compensable damages.

WHEREFORE, plaintiffs request the following relief:

(a)     on their first claim, judgment declaring that the Norris-LaGuardia Act

deprives the federal courts of jurisdiction to enjoin or restrain the ongoing lockout without regard

to any purported disclaimer by the NHLPA;

(b)     on their second claim, judgment declaring that the NHL's ongoing lockout

of NHL players in support of the NHL's collective bargaining position does not violate the

antitrust laws without regard to the validity of any purported disclaimer by the NHLPA because

such conduct would be protected from antitrust attack by the labor exemption from the antitrust

laws set forth in Section 20 of the Clayton Act, and thus does not result in any legally cognizable

or compensable damages to NHL players;

(c)     on their third claim, judgment declaring that the ongoing lockout does not

violate the antitrust laws without regard to any purported disclaimer by the NHLPA because the

NHLPA's purported disclaimer of interest is insufficient to terminate the non-statutory

exemption to the antitrust laws, and thus the NHL's lockout does not result in any legally

cognizable or compensable damages to NHL players;

(d)     on their fourth claim, judgment declaring that, under principles of implied

immunity, a court, as a matter of law, is precluded from invoking the antitrust laws to condemn a

substantive right (an employer's right to lock out its employees) guaranteed by the labor laws,

and thus the NHL's lockout does not result in any legally cognizable or compensable damages to

NHL players;

(e)     on their fifth claim, judgment declaring that any harm to the NHL players is a result of lawful aspects of the NHL's lockout and thus cannot form the basis of an antitrust damages claim;

(f)     on their sixth claim, judgment declaring that the ongoing lockout does not violate the antitrust laws without regard to any purported disclaimer by the NHLPA because such conduct would constitute a temporary bargaining measure, is ancillary to the legitimate purposes of the NHL's joint venture, and has procompetitive justifications that outweigh any alleged anticompetitive effects, and thus does not result in any legally cognizable or compensable damages to NHL players;

(g)     on their seventh claim, judgment declaring that if the NHLPA's disclaimer were not found to be invalid and unlawful under federal labor law, and the collective bargaining relationship between the parties were not otherwise to continue, the SPCs would be void and unenforceable, and no player would be entitled to any benefits or other terms and conditions of employment pursuant to such SPCs;

(h)     an order determining that the claims alleged herein may be maintained as a defendant class action under Rule 23(a), (b)(1)(A), (B), and/or (b)(2) of the Federal Rules of Civil Procedure and certifying the Class as defined above; and

(i)     such other and further relief as the Court shall deem proper.

Dated:    New York, New York
            December 14, 2012

L. Robert Batterman
Joseph Baumgarten
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York  10036
Telephone:  (212) 969-3000
Facsimile:  (212) 969-2900
rbatterman@proskauer.com

Shepard Goldfein
James A. Keyte
Paul M. Eckles
Matthew M. Martino
Elliot A. Silver
**SKADDEN, ARPS, SLATE, MEAGHER &**
**FLOM LLP**
Four Times Square
New York, New York  10036
Telephone:  (212) 735-3000
Facsimile:  (212) 735-2000
shepard.goldfein@skadden.com

*Attorneys for Plaintiffs*